UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JESSE REZENDES, Derivatively on Behalf of
WORLD WRESTLING ENTERTAINMENT,
INC.,

                 Plaintiff,

    v.

VINCENT K. MCMAHON,
GEORGE A. BARRIOS, and
MICHELLE D. WILSON,

                 Defendants,

   -and-

WORLD WRESTLING
ENTERTAINMENT,INC.,

                 Nominal Defendant.

Civil Action No.:

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

This is a shareholder derivative action on behalf of Nominal Defendant World Wrestling Entertainment, Inc. ("WWE" or the "Company") for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and for misappropriation of material, non-public information under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949) against Defendants Vincent K. McMahon, George A. Barrios, and Michelle D. Wilson (together, "Defendants"). Defendants serve, or previously served, as senior executives of WWE.

## NATURE OF THE ACTION

1.     WWE produces wrestling entertainment content for distribution worldwide, including in the Middle East and North Africa ("MENA"). In November 2018, WWE's media

rights agreement with Orbit Showcase Network ("OSN") to distribute WWE wrestling content in the MENA region (the "OSN Agreement") came to an abrupt and unexpected end because of a dispute between the parties to the agreement. This left WWE scrambling to find a replacement media rights agreement with the Saudi General Sports Authority before expiration of the media rights under the OSN Agreement.

2. Rather than disclose these problems, Defendants commenced an unlawful scheme to maintain the trading price of WWE common stock at artificially inflated levels even though they knew the market would negatively react if it had learned that the OSN Agreement was terminated early with no renewal agreement in place, and the Company's projections would accordingly have to be adjusted downward. For almost a year, Defendants repeatedly misled WWE shareholders about the status of the OSN Agreement even though they knew it terminated early in November 2018. Defendants also misled shareholders about the status of WWE's efforts to secure a replacement media rights agreement with Saudi Arabia.

3. By misrepresenting the circumstances surrounding WWE's media partnerships in the MENA region, Defendants breached their fiduciary duties of care and loyalty. As WWE's top officers, Defendants owed WWE a legal duty to speak the entire truth whenever they undertook to speak about WWE's business or prospects. Worse yet, before Defendants publicly disclosed the adverse material non-public facts surrounding the Company's MENA media rights, Defendants unloaded over 3.4 million shares of their personal holdings of WWE common stock, garnering insider trading proceeds of more than $280 million, and avoiding over $141 million in losses.

4. Defendants' scheme continued unabated until October 31, 2019, when the Company issued a press release disclosing that revenues and operating income declined year over year to $186 million and $6.4 million, respectively. Additionally, the Company lowered its full

year 2019 adjusted operating income before depreciation and amortization ("OIBDA") to a range of $180 million to $190 million largely because of the Company's failure to secure a MENA rights agreement with the Saudi government. On this news, the trading price of WWE common stock declined $10.40 per share, or 15.65%, to close at $56.04 per share on October 31, 2019.

5.      The truth continued to leak out on January 30, 2020, when the Company announced Defendants Barrios and Wilson, two senior and long-serving executives, abruptly left the Company and preannounced that the adjusted OIBDA for the full year 2019 was now going to be at the lower end of an already lowered guidance. In response, the Company's stock declined $13.42 per share, or 21.54%, to close at $48.88 per share on January 31, 2020, wiping out millions in once valuable shareholders' equity.

6.      The Company's worsening prospects in Saudi Arabia and the effect that unstable relationship would have on the likelihood of renewing a past or securing a new media rights deal was finally and fully revealed on February 6, 2020, when the Company announced disappointing results for the fourth quarter 2019, and reduced guidance for the full year 2020.

7.      Due to Defendants' myriad misrepresentations that had artificially inflated the Company's stock price but were subsequently revealed, WWE shareholders sued the Company and others, including the Defendants named herein, for violations of the federal securities laws in what proved to be an expensive and costly class action lawsuit. *See City of Warren Police & Fire Retirement System v. World Wrestling Entertainment, Inc., et al*., No. 1:20-cv-02031-JSR (S.D.N.Y.) (the "Securities Action").

8.      On August 6, 2020, U.S. District Judge Jed S. Rakoff of the United States District Court for the Southern District of New York sustained the Securities Action claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Judge Rakoff found: "Given

WWE could not have been engaged in such renewal negotiations at the time because OSN had already terminated the agreement, the complaint has adequately explained with particularity why defendants' "renewal" and "ongoing" negotiation statements were false and misleading."[1]

9.      Judge Rakoff continued: "Given the alleged importance of a MENA agreement to WWE's financial projections, plaintiff has thus adequately alleged with particularity not only that WWE failed to disclose its inability to renew a key agreement, but also that this failure had adversely affected WWE's 'financial outlook' by February 2019. Plaintiff has thus alleged with particularity the reasons the February 2019 risk disclosure statement was misleading."[2]

10.     On August 19, 2020, Judge Rakoff ordered a civil case management plan requiring the defendants to answer the consolidated amended class action complaint by August 28, 2020.[3] Under the plan, initial disclosures were to be served by August 24, 2020; the first requests for documents were to be served by August 26, 2020; all depositions were to be completed by January 19, 2021; and all class certification discovery and depositions were to be completed by November 20, 2020.[4]

11.     On August 28, 2020, the defendants in the Securities Action answered the consolidated amended complaint.[5] Lead plaintiff filed a motion for class certification on October

---

[1] *See* Order Denying Defendants' Motion to Dismiss at 10-11, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc., et al*., 477 F. Supp. 3d 123 (S.D.N.Y. 2020) (No. 1:20-cv-02031-JSR) (the "Securities Action Order Denying Defendants' Motion to Dismiss").

[2] *Id*. at 12-13.

[3] *See* Civil Case Management Plan at 1, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc., et al*., No. 1:20-cv-02031-JSR (S.D.N.Y. Aug. 19, 2020), ECF No. 79.

[4] *Id.* at 1-3.

[5] *See* No. 1:20-cv-02031-JSR. Defendants.' Answer to Plaintiff's Consolidated Amended Class Action Complaint, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc., et al*., No. 1:20-cv-02031-JSR (S.D.N.Y. Aug. 28, 2020), ECF No. 80.

6, 2020.[6] On November 23, 2020, Judge Rakoff stayed the case until December 23, 2020 after the parties agreed to a term sheet regarding settlement.[7] On December 23, 2020, plaintiff in the Securities Action filed a motion for preliminary approval of the settlement.[8] On December 28, 2020, Judge Rakoff extended the stay until the resolution of the motion for preliminary approval.[9]

12.     On March 7, 2021, Judge Rakoff preliminarily approved settlement of the Securities Action for $39 million.[10]   The final approval hearing for the proposed settlement is scheduled for June 15, 2021.[11]

13.     By misleading WWE shareholders and selling their stock at artificially inflated prices while in possession of material, non-public information, Defendants breached their fiduciary duty to avoid self-dealing and unjustly enriched themselves at WWE's expense.   Nevertheless, WWE's board of directors (the "Board"), which is dominated and controlled by Defendant Vincent K. McMahon, has not, and will not, take legal action against Defendants.  This fact is borne out by the Board's decision to constructively refuse and effectively reject Plaintiff's November 24, 2020, litigation demand.

---

[6] *See* Notice of Plaintiff's Motion for Class Certification, Appointment as Class Representative, and Appointment of Class Counsel, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc., et al.*, No. 1:20-cv-02031-JSR (S.D.N.Y. Oct. 6, 2020), ECF No. 85.

[7] *See* Stay Order, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc., et al.*, No. 1:20-cv-02031-JSR (S.D.N.Y. Nov. 23, 2020), ECF No. 100.

[8] *See* Notice of Lead Plaintiff's Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc., et al.*, No. 1:20-cv-02031-JSR (S.D.N.Y. Dec. 23, 2020), ECF No. 102.

[9] *See* Stay Order, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc., et al.*, No. 1:20-cv-02031-JSR (S.D.N.Y. Dec. 28, 2020), ECF No. 106.

[10] *See* Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement at 14, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't, Inc., et al.*, 2021 U.S. Dist. LEXIS 46163 (S.D.N.Y. Mar. 7, 2021) (No. 1:20-cv-02031-JSR).

[11] *Id.* at 4.

14. Counsel representing the purported independent directors acknowledged receipt of the demand on November 25, 2020. Counsel to Plaintiff sent several emails to counsel for the purported independent directors requesting information about when the review would be completed. In short, counsel for the purported independent directors did not provide a definitive answer beyond stating on April 26, 2020, that he "hope[d] to wrap up fact discovery in the next few months barring any changes."

15. Counsel for Plaintiff responded that the process was needlessly prolonged given that the Securities Action was resolved months before and that Plaintiff's demand was not the only litigation demand served on WWE and its directors in November 2020.

16. On April 27, 2021, (five months after serving the litigation demand), counsel for the purported independent directors wrote Plaintiff's counsel chastising him for his repeated inquiries concerning the status of the investigation. Despite casting aspersions on Plaintiff's counsel's inquiries and well-founded concern that the process was dragging for no discernable legitimate purpose, counsel for the independent directors stated that the process might be over by June "but that date could slip to July."

17. On April 27, 2021, Plaintiff's counsel responded to the letter in an email. Plaintiff's counsel reiterated that the process was unreasonably prolonged and stated that he believed that based on the record to date the "demand appears to have been effectively rejected." Counsel to the purported independent directors did not respond and thus acquiesced to Plaintiff's conclusion that demand was effectively rejected.

18. Delaware law requires the Board to timely accept or reject a litigation demand. A board cannot lawfully defer or otherwise ignore its legal obligation to respond to a litigation demand. But this unlawful course of action is precisely the one chosen by WWE's Board. Worse

yet, while failing to discharge its own fiduciary duties, the Board abetted Defendants' defense of myriad lawsuits triggered by their knowing violations of the federal securities and other laws.

19.    The Board does not have WWE's best interest in mind.  Accordingly, Plaintiff brings this action to further WWE's best interests.  The derivative claims asserted in this Complaint will protect WWE's valuable claims against Defendants and once finally adjudicated, make WWE whole for damages and injuries suffered due to Defendants' unlawful misconduct.

## JURISDICTION AND VENUE

20.    The Court's jurisdiction is founded upon: (a) diversity of citizenship, 28 U.S.C. § 1332, and (b) supplemental jurisdiction, 28 U.S.C. § 1367(a). Plaintiff is a citizen of the Commonwealth of Massachusetts. The individual Defendants are all citizens of the State of Connecticut. The Nominal Defendant is a citizen of the State of Connecticut and the State of Delaware. The matter in controversy exceeds the sum or value of $75,000, exclusive of interests or costs.

21.    The Court has personal jurisdiction over the individual Defendants because they are all citizens of the State of Connecticut. The Court has personal jurisdiction over the Nominal Defendant Company because its principal place of business is in Connecticut.

## THE PARTIES

22.    Plaintiff Jesse Rezendes is a citizen of Massachusetts. He is a current owner of WWE common stock. He has held the stock since July 2018. Mr. Rezendes served a demand for books and records pursuant to 8 *Del C§* 220 on August 13, 2020.  On November 24, 2020, Mr. Rezendes served a litigation demand on WWE's Board.   As of the date of the filing of this complaint, neither WWE's Board nor its counsel have provided a substantive response to the litigation demand that was filed over five months ago in November 2020.  Mr. Rezendes' litigation demand has been constructively refused and effectively rejected.

23.     Nominal Defendant WWE is a Delaware corporation with its principal executive offices located at 1241 East Main Street, Stamford, Connecticut 06902.  According to its public filings, WWE is an integrated media and entertainment company engaged in the production and distribution of wrestling entertainment content through various channels, including pay-per-view and live events.  WWE's stock trades on the New York Stock Exchange under the ticker symbol "WWE."

24.     Defendant Vincent K. McMahon ("McMahon") is the CEO of WWE as well as Chairman of the Board that he dominates and controls since 1980. McMahon is a citizen of Connecticut.

25.     Defendant George A. Barrios ("Barrios") served as a director and the co-President of WWE from February 2018 to January 2020.  Previously, Barrios served as WWE's Chief Strategy & Financial Officer from November 2013 to January 2018. Barrios is a citizen of Connecticut.

26.     Defendant Michelle D. Wilson ("Wilson") served as a director and the co-President of WWE from February 2018 to January 2020.  Previously, Wilson served as WWE's Chief Revenue & Marketing Officer from November 2013 to January 2018. Wilson is a citizen of Connecticut.

## THE FIDUCIARY DUTIES OF WWE'S OFFICERS

27.     The officers of a Delaware corporation owe fiduciary duties of care and loyalty. They are expected to pursue the best interests of the company in good faith (*i.e.*, to fulfill their duty of loyalty) and to use the amount of care that a reasonably prudent person would use in similar circumstances (*i.e.*, to fulfill their duty of care).  Moreover, corporate officers can be held liable for damages to the corporation if they act with gross negligence.  Unlike directors, corporate

officers cannot be shielded from personal liability by 8 *Del. C.* § 102(b)(7). Thus, officers face a statutory exposure to liability that is often greater than directors.

28.     Corporate officers are under a fiduciary duty to avoid making false and misleading disclosures. To this end, corporate officers must speak only the complete and unvarnished truth whenever they speak for the corporation. Corporate officers likewise must avoid using their positions of trust and confidence for personal gain by disclosing all material, non-public information before trading in the corporation's common stock.

29.     Here, Defendants breached these fiduciary duties.

## FACTUAL ALLEGATIONS

### A.  Background

30.     WWE is an integrated media and entertainment company that is primarily known for its scripted professional wrestling shows. Like other professional wrestling promotions, WWE shows are not bona fide contests of athletics, but are entertainment based and feature storyline-driven, scripted, and choreographed matches, though matches often include wrestling moves that can put performers at risk of injury, even death, if not performed correctly. Since the l980s, WWE has publicly branded its product as sports entertainment, acknowledging the product's roots in competitive sport and dramatic theater.

31.     WWE reports revenues in three segments: Live Events, Media, and Consumer Goods (merchandise). Live Events provides ongoing content for WWE's media platforms. Live Events revenues consist primarily of ticket sales, including primary and secondary distribution, revenues from events for which WWE receives a fixed fee, as well as the sale of travel packages associated with WWE's global live events. The Media segment reflects the production and monetization of long-form and short-form media content across various platforms, including WWE Network, pay television, digital and social media, as well as filmed entertainment. Across

these platforms, revenues principally consist of content rights fees, subscriptions to WWE Network, and advertising and sponsorships. Media net revenues were $683.4 million, $535.6 million, and $476.9 million, representing 73%, 67%, and 65% of WWE's total net revenues in fiscal years 2018, 2017, and 2016, respectively.

32.     Beginning in 2014, the government of Saudi Arabia began hosting several WWE live events in that country. The events were very lucrative for WWE, and later expanded as part of Saudi Arabia's social and economic reform program named "Saudi Vision 2030."

33.     OSN is a direct-broadcast satellite provider serving the MENA region. OSN has traditionally offered popular entertainment content such as movies, sporting events, and various TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region. The OSN is owned and operated by Panther Media Group Limited, a joint venture between a Kuwait-based company and Mawarid Holding, a private Saudi investment company controlled by the Al Saud royal family.

34.     On July 21, 2014, WWE and OSN announced a five-year exclusive media agreement, stating that "WWE's flagship television program Monday Night Raw® [would] air live on OSN, WWE's exclusive pay TV partner in the Middle East and North Africa through 2019."[12] According to the press release WWE and OSN published that day, "[u]nder this new agreement, fans [could] now enjoy all of WWE's programming, including Raw, SmackDown®, NXT™ and Main Event™, as well as WWE pay-per-view events including WrestleMania® and SummerSlam®, in one place on OSN Sports 2 HD." *Id*. The OSN Agreement with WWE was estimated by analysts to generate an average annual value of between $15 million and $20 million

---

[12] *See* July 21, 2014 press release https://corporate.wwe.com/news/company-news/2014/07-21-2014

for WWE (with an estimated $25 million to $30 million revenue contribution in the agreement's final 12 months). In addition, the deal with OSN offered the additional benefit of growing the sport in the MENA region.

35.     In the years that followed, expansion into the MENA region became an increasingly important part of WWE's business plans and growth initiatives, as the Middle East grew to become WWE's second largest market. In March 2018, the Saudi Press Agency announced that WWE and the Saudi General Sports Authority had signed a 10-year multi-platform partnership with WWE to hold wrestling events in the country. Analysts estimated the partnership was worth about $500 million to WWE.

36.     The first event held under the Saudi partnership was the Greatest Royal Rumble, which took place on April 27, 2018, at the King Abdullah International Stadium in Jeddah. WWE hailed the event as the largest "outside the U.S. in the past 16 years" and a major contributor to WWE's "record" second quarter 2018 results. The event, however, prompted criticism from fans because WWE held the event without female wrestlers in accordance with Saudi government policies. Female fans were allowed to attend if accompanied by a male "guardian." During the show, a WWE commercial was aired that included female wrestlers in their ordinary regalia, inciting the Saudi General Sports Commission to issue an apology to Saudi citizens for the "indecent material."

37.     Despite causing the Saudi General Sports Commission to issue an apology for WWE's actions, WWE continued to view business dealings with the Saudi government as a lucrative entrance point into the MENA region and a key pillar of its business plans. For example, in discussing WWE's "record" second quarter 2018 results, McMahon stated, "We're pleased with our continued success in increasing the monetization of WWE content globally." He claimed this

"success is evidenced by...the development of a 10-year strategic partnership with the Saudi General Sports Authority," which he listed as among WWE's most important international initiatives. There were two events per year in Saudi Arabia in 2018 and 2019.[13]

**WWE Hides Tensions with the Saudi Government from Investors**

38.     On October 2, 2018, the world was shocked to learn of the murder of journalist Jamal Khashoggi, in which the Saudi government was implicated. It was rumored that the next anticipated WWE live event scheduled to take place in Saudi Arabia, Crown Jewel, might be cancelled as a result. But the event went forward, with WWE stating on October 25, 2018, in connection with its third quarter 2018 results, that "[s]imilar to other U.S.-based companies who plan to continue operations in Saudi Arabia, the Company has decided to uphold its contractual obligations to the General Sports Authority." However, the incident placed added strain on the relationship between WWE and the Saudi government, which had begun to break down by at least the start of 2019.

39.     By at least early 2019, tensions in the relationship between WWE and the Saudi government had reached a breaking point. Despite the tensions with the Saudi government, WWE represented that it had continued to bolster its relationship with Saudi Arabia and was making significant progress on the renewal of the critical media agreement and its business initiatives in the country. McMahon, Barrios, and Wilson repeatedly stressed the importance of WWE's MENA revenue, claiming that it would enable it to meet its target of $200 million adjusted OIBDA for fiscal 2019.

---

[13] *See* Form 8-K filed with the SEC on July 26, 2018, https://www.sec.gov/Archives/edgar/data/1091907/000109190718000030/wwe-20180726x8k.htm.

40.     As alleged in the Securities Action, which has since settled following a mediation, the Saudi government had refused to make millions of dollars in payments owed to WWE for events conducted in 2018.

41.     Further, in 2018, OSN was contemplating the early termination of its obligations under its broadcasting agreement (ultimately terminated in March 2019) and had rebuffed WWE's efforts to renew the agreement. These developments threatened WWE's ability to reach a renewed media agreement in 2019, which WWE told investors was critical to its expansion plans in the MENA region and its growth prospects. Moreover, WWE was facing withering consumer engagement in its traditional markets, heightening the need for WWE to reach an agreement with the Saudi government on favorable terms.

42.     As 2019 unfolded, WWE shareholders became increasingly focused on the status of the Company's media partnerships in the MENA region, including its media rights agreement with OSN.  Unknown to the public, however, WWE's agreement with OSN had ended prematurely in November 2018 over a dispute, leaving WWE scrambling to find a replacement media rights agreement in the region.

43.     Rather than publicly disclose these adverse developments, Defendants falsely reassured the Company's shareholders that the renewal of its media partnerships in Saudi Arabia remained on track and would be even more lucrative for the Company.  In doing so, Defendants breached their fiduciary duty to speak only the complete truth and to avoid disseminating false information to shareholders.  While misleading shareholders, Defendants also sold over 3.4 million shares of their personal WWE stock, for over $280 million in unlawful insider trading proceeds, a classic self-dealing breach of fiduciary duty under Delaware law.

44. Defendants' unlawful scheme to maintain the trading price of WWE common stock at artificially inflated levels continued unabated throughout most of 2019. In early 2020, the truth fully emerged with disastrous consequences for WWE and its shareholders, as detailed below.

**B. Defendants' Misrepresentation and Material Omissions**

**February 7, 2019 – Full Year 2019 Inflated Financial Guidance**

45. Defendants caused the Company to issue numerous false and misleading statements that exposed it to liability under the federal securities laws. These statements also artificially inflated the Company's stock price thereby allowing the Defendants sell their shares into the market and reap unjustified profits. Specifically, on February 7, 2019, Defendants announced WWE's financial results for fourth quarter and year end 2018, ended December 31, 2018, as well as the Company's financial outlook for 2019. As to the latter, Defendants caused WWE to misrepresent that "management expects the Company to achieve another year of record revenue of approximately $1.0 billion and, as previously communicated, is targeting Adjusted OIBDA of at least $200 million, which would also be an all-time record (up at least 12% from Adjusted OIBDA of $178.9 million in 2018)."[14]

46. On the same date, Defendants participated in a conference call for WWE shareholders and securities analysts. During the call, Defendant Barrios stated, with respect to the Company's critically important media "rights renewal process" outside the United States, that "it's fair to say that all the agreements will be completed substantively by the middle of the year, so we'll announce those as they get done."

---

[14] *See* Form 8-K filed with the SEC on February 7, 2019, https://www.sec.gov/Archives/edgar/data/1091907/000109190719000009/wwe-20190207x8k.htm

47.     On February 7, 2019, WWE filed its 2018 Annual Report with the SEC on Form 10-K for the year ended December 31, 2018 (the "2018 10-K"). In the 2018 10-K, Defendants emphasized the importance of the Company's customer relationships in Saudi Arabia, stating "we have several important partners, including...the General Sports Authority of the Kingdom of Saudi Arabia who, among other things, hosts our live events in the Middle East."[15]

**February 26, 2019 – Morgan Stanley Technology, Media & Telecom Conference**

48.     A few weeks later, on February 26, 2019, Barrios presented at the Morgan Stanley Technology, Media & Telecom Conference and stated that the negotiations on the MENA distribution rights deal were "ongoing," with a target to "get that locked down by the middle of the year." Barrios continued that the "Middle East is now #2 in 2018 after the U.S." in terms of gross monetization and that "locking those [media-rights agreements] down [is], obviously, important for us strategically because our distribution partners for the core content is a key part of the value creation for the business, important for us financially. We'll have a lot of visibility over the next several years for a pretty significant portion of our revenue, so really important."

49.     In response to a question from a Morgan Stanley analyst about wrapping up negotiations on outstanding media rights deals and whether those deals would contribute revenue as soon as the fourth quarter of 2019, Defendant Barrios confirmed they would:

> **Benjamin D. Swinburne [Morgan Stanley, Research Division]:**
>
> Yes, and then just to wrap up on this – on the rights front. Once we get all these deals done, revenue will step up nicely in '20 and in the fourth quarter this year. These projects that you've got going on are stuff that you guys are making determinations that are worth spending money on.

---

[15] *See* 2018 10-K,
https://www.sec.gov/Archives/edgar/data/1091907/000109190719000016/wwe-20181231x10k.htm.

**George A. Barrios:**

That's right.

\*\*\*

**Swinburne:**

Okay. We're out of time. George, good luck with all the international renewals. I'm sure they'll visit.

**Barrios:**

Great. Guys, thank you.[16]

50.     On February 27, 2019, the day after Barrios personally misled the public, he used his insider knowledge regarding the prematurely terminated OSN Agreement and deteriorating relationship with Saudi Arabia to dump 40,000 of his WWE shares for total proceeds of approximately $3,351,810 while the stock price was artificially inflated. McMahon waited until March 27, 2019, to off-load 3,204,427 shares for total proceeds of approximately $261,000,579 while the stock price was artificially inflated.

### April 25, 2019 – Disappointing First Quarter Results with Adjusted Second Quarter Guidance

51.     On April 25, 2019, Defendants announced WWE's financial results for the first quarter of 2019, which included lower year-over-year revenues.  In response to the Company's disappointing first quarter 2019 results, the Company adjusted its second quarter 2019 financial outlook, stating "[f]or the second quarter 2019, the Company estimates Adjusted OIBDA of $19 million to $24 million.  This range of results represents a year-over-year decline in Adjusted

---

[16] Unless otherwise noted, all emphases in quotations cited in this Complaint have been added.

16

OIBDA driven by increases in fixed costs, including the timing of strategic investments."[17] For the full year 2019, the Company's guidance remained largely unchanged, with Defendants stating that "management is targeting another year of record revenue of approximately $1.0 billion and, as previously communicated, Adjusted OIBDA of at least $200 million, which would also be an all-time record (up at least 12% from Adjusted OIBDA of $178.9 million in 2018)." *Id*.

52.     On the same date, Defendants participated in a conference call for WWE shareholders and securities analysts. During the call, Barrios stated, with respect to the Company's 2020 financial outlook, that "[w]e continue to expect strong year-over-year growth in 2020." Barrios further stated, with respect to the timing for completion of the Company's international media rights agreements in MENA and elsewhere, that "we're in the process of finalizing our distribution plans for Raw and SmackDown in several international markets. We expect to finalize these plans later this year and once we have done that and added visibility for 2020 and the rest of our business, we'll provide additional perspective on our strategy, key initiatives, 2020 financial expectations as well as a longer-term financial model." Critically however, Defendants failed to disclose that the Company's media rights agreement with one of its key MENA customers, OSN, had been prematurely terminated under a settlement between WWE and OSN months earlier in late 2018.

**June 26, 2019 – Investor Presentation**

53.     On June 26, 2019, Michael Weitz, Senior Vice President of Investor Relations, presented to investors at the 6th Annual Bernstein Future of Media Summit Conference, stating that the media deal in the Middle East, among others, is an "important deal[]," and while not

---

[17] *See* Form 8-K filed April 25, 2019,
https://www.sec.gov/Archives/edgar/data/1091907/000109190719000027/wwe-20190425x8k.htm

completed, he touted that "there are elements to those [deals] that that we feel really good about."

Mr. Weitz added:

> **We've also been very public that there's another series of deals that are important to us right now. So we -- just to answer your question about kind of what's around the corner. The deals that we talked about U.K., India, China, Latin America and the Middle East.** And so we put out some releases over the past 2 weeks that we've been successful in completing deals in the U.K., we've been successful in completing it in Latin America, and we've been successful, whom am I missing, in China. So those are the 3. **So there's still a few to go, India, in particular, and the Middle East, in particular.** And by the way, next -- somewhere down the path will be Germany. **So those are coming and important deals for us. So we're not going to talk terms, but there's really interesting elements of those that become really important. The ability to expand reach through elements like free-to-air, the ability to offer -- to commit our partners to localize content really important.** That helps build the engagement. So the -- so while I'm not talking about direct economic terms, there are elements to those that we feel really good about. So that's that. So...

54.     On July 22, 2019, three days before the Defendants finally disclosed the termination of the OSN Agreement, Barrios dumped 74,678 shares for total proceeds of approximately $5,232,080.

**July 25, 2019 – Defendants finally disclose the end of the OSN Agreement with the highly improbable media-rights agreement for the MENA region to further inflate the stock price.**

55.     On July 25, 2019, Defendants announced WWE's financial results for the second quarter of 2019, as well as the Company's financial outlook for the remainder of 2019. As for the remainder of 2019, Defendants caused WWE to reiterate "its full year guidance, which targets revenue of approximately $1 billion and Adjusted OIBDA of at least $200 million," adding, "[t]his guidance assumes continued improvement in WWE's engagement metrics, a second large scale

event in the MENA region, and the completion of a media rights deal in the MENA region."[18]  As to the timing for completion of the MENA media rights deal, Defendants caused WWE to state that "[t]he Company believes it has agreements in principle with the Saudi General Sports Authority on the broad terms for the latter two items; however, this understanding is nonbinding."

56.    On the same date, Defendants finally acknowledged in an earnings call that the OSN Agreement had ended.[19] But McMahon, Barrios, and Wilson blunted the impact of this news by emphasizing the media-rights agreement for the MENA region during the earnings call. To assuage concerns that the deal would take time -- and might not get done by the end of 2019, which was necessary for WWE to meet its full-year 2019 OIBDA guidance -- McMahon told investors that the new deal with the Saudis would be complete "very soon."

57.    During the earnings call, Defendant McMahon stated, with respect to the media-rights agreement in the Middle East, that "[o]bviously, there's India and MENA to do, and we are going to be close to announcing those deals very soon."

58.    During the same call, Barrios stated "[d]uring the quarter, we achieved adjusted OIBDA of $34.6 million, which exceeded our guidance, primarily due to enhanced revenue recognized in conjunction with our recent event in Saudi Arabia. That enhanced revenue is expected to reverse in connection with an anticipated fourth quarter event in that country." Barrios spoke further on the Company's guidance and the positive relationship it had with the Company:

> **For the full year, we continue to target record revenue of approximately $1 billion and adjusted OIBDA of at least $200 million. This guidance assumes** continued improvement in our engagement metrics, **a second large-scale event in the MENA region and the completion of a media rights deal in the MENA**

---

[18] *See* Form 8-K filed with the SEC on July 25, 2019, https://www.sec.gov/Archives/edgar/data/1091907/000109190719000041/wwe-20190725x8k.htm

[19] *See* Securities Action Order Denying Defendants' Motion to Dismiss at 3, 8.

**region. We believe we have agreements in principles with the Saudi -- in principle with the Saudi General Sports Authority on the broad terms for the latter 2 items.** However, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or that engagement does not improve as assumed. We valuated these potential outcomes and currently believe that [the] most likely downside to our adjusted OIBDA would be approximately $10 million to $20 million below our current outlook. **Our full year guidance reflects strong fourth quarter results, substantial revenue growth** from both our new content distribution agreements in the U.S. which become effective in that period, **and the aforementioned media rights deal in the MENA region.**

As you know, **we're in the process of finalizing our distribution plans for Raw and SmackDown in 2 international markets, India and the Middle East**. **As we stated in our last earnings call, we expect to finalize these plans later this year**…

59. Barrios added that "[i]n the Middle East, our Pay TV agreement has been terminated, but our free-to-air agreement continues to be in place."

60. One analyst asked, "what's going on in Saudi Arabia under the deal terms[.]"

Barrios responded:

Yes, so we just had an event on June 7. That event was part of the 10-year agreement that we've signed. And Laura, what we're saying is right now in our forecast, which is what suspends our guidance, our guidance is our internal forecast, we are assuming that we'll do a second event in the region and that we will also complete a media rights deal in the region. And if those 2 comes to fruition, we believe we'll hit our $200 million. And what we're saying on the downside is, if some combination – obviously, it's not the ultimate downside case, but our best estimate of a downside case, around either those developments not coming to fruition or the engagement not improving to the level we expect it to.

We estimate the most likely downside at $10 million to $20 million. On the free cash flow side in the quarter, because of the timing of the event and the accounts receivable, our collection of that, because it happens so much later in the quarter. Last year, the MENA event happened on April 27. So we collected in the second quarter, so we didn't have an outstanding AR at the end of the quarter. This time, we expect to collect in the third quarter, which is why you see that. So you'll see that reverse.

61.     During the call, Wilson stated that "[d]uring the quarter, we continue[d] to successfully stage large-scale events for our fans, including . . . Super ShowDown in Jeddah, Saudi Arabia."

62.     The Defendants were materially misleading the public regarding the status of WWE's relationship with the Saudi government. At the time these statements were made, the relationship between the WWE and the Saudi government was deteriorating, in part because of payments the Saudis delayed making in connection with the live events held in 2018, as well as due to controversies associated with those events.

63.     Moreover, according to the Securities Action, the WWE and the Saudi government were still very far apart in their negotiations on a media rights deal for the MENA region in Fall 2019. Thus, it was misleading to say that an **"agreement in principle"** had been reached by the parties months earlier in July 2019, and McMahon, Barrios, and Wilson knew that any new media rights deal for the MENA region would not get done in 2019.[20] ("[T]he fact that the parties had not agreed on fundamental terms of a contract by the Fall 2019 strongly supports the inference that [WWE] could not have had a near-final agreement a few months earlier."); see also Securities Action Order Denying Defendants' Motion to Dismiss at 18-19, 29 (finding that plaintiff's "allegations, particularly in light of the defendants' senior positions at WWE...support the proposition that not only WWE generally but also [Insiders McMahon, Barrios, and Wilson]...knew or recklessly disregarded that their statement that there was in fact an agreement in principle was false").

64.     As a result of Defendants' materially false and misleading statements and omissions stated above, WWE's stock price was artificially inflated. The Defendants' statements on July 25,

---

[20] *See* Securities Action Order Denying Defendants' Motion to Dismiss at 17.

2019 further inflated the stock by $1.31 per share, or about 1.75%, to close at $75.99 per share on July 26, 2019.

65.     On August 8, 2019, only a few weeks after the materially false and misleading statements by Defendants on July 25, 2019, Wilson used her insider knowledge to sell a large portion of her WWE holdings at artificially inflated prices before the truth began to emerge. Specifically, she sold 158,135 shares for total proceeds of approximately $10,958,686.

**C.  The Truth Begins to Emerge**

**October 31, 2019 – WWE's Relationship with Saudi Arabia Leads to a Hostage Situation**

66.     On October 31, 2019, WWE issued a press release providing its third quarter 2019 financial results to investors. The press release stated that WWE's revenues and operating income had continued to decline year over year to $186.3 million and $6.4 million, respectively. WWE also announced that it was lowering its full year 2019 adjusted OIBDA guidance to a range of $180 million to $190 million due in large part to WWE's failure to complete a MENA distribution agreement with the Saudis. On a conference call to discuss the results, Barrios stated that "no assurances" could be given that the deal would ever be completed.[21]

67.     As reported by *The Wall Street Journal* that evening, Benchmark analyst Mike Hickey stated that "by lowering its outlook now rather than missing fourth quarter expectations, the company is signaling that it doesn't have a lot of confidence a deal will get done."[22]

---

[21] *See* Form 8-K filed with the SEC on October 31, 2019, https://www.sec.gov/ix?doc=/Archives/edgar/data/1091907/000109190719000050/wwe-20191031x8k.htm.

[22] *See* https://www.wsj.com/articles/world-wrestling-entertainment-shares-fall-on-lower-revenue-delayed-tv-deal-11572546215.

68.     That same day, WWE held the Crown Jewel live event in Riyadh. After the event ended, shocking news reports surfaced claiming that the Saudi government was effectively holding a number of WWE's wrestlers hostage by grounding their flight home in retaliation for McMahon's decision to delay a live broadcast of Crown Jewel until the Saudis made tens of millions of dollars in past due payments. Estimates for the amount outstanding ranged from $60 million to as much as $500 million. Additionally, according to the Securities Action, it was revealed in early November 2019 that the Saudi government had failed to make numerous payments on time, and that WWE's dispute with the Saudis was what caused the flight delays-not a mechanical issue, as WWE stated publicly.

69.     WWE's Chief Accounting Officer has since admitted that the Saudi Government delayed making a $60 million payment in connection with the June 7, 2019 event, and delayed making smaller, but still considerably sized, payments in connection with the 2018 and 2019 events held in the country.

70.     In response to this news, the Company's stock price fell $10.40 per share, or 15.65%, to close at $56.04 per share on October 31, 2019.

**November 4, 2019 – Press Release**

71.     Just a few days later on November 4, 2019, Defendants stated that, "[f]ollowing the historic *Crown Jewel* event in Riyadh, WWE... and the Saudi General Entertainment Authority (GEA) have expanded their live event partnership through 2027 to include a second annual large-scale event." Defendants also announced that "WWE and GEA also continue to work towards the completion of a media agreement in the MENA region."[23]

---

[23] *See* press release dated November 4, 2019, https://corporate.wwe.com/investors/news/press-releases/2019/11-04-2019-215634106.

**December 9, 2019 – Company Conference Presentation**

72.     On December 9, 2019, Barrios presented to investors at the UBS Global TMT Conference. During the conference and in response to an analyst's question regarding "international renewals," Barrios continued to mislead the market about the prospects of completing the Saudi media deal, stating that it was still "working through [the deal]" and at that point there was "nothing really to update."

**January 7, 2020 – Citi 2020 Global TMT West Conference**

73.     On January 7, 2020, Barrios spoke at the Citi 2020 Global TMT West Conference where he admitted that WWE had prematurely announced the near completion of a media rights deal with the Saudi government in July 2019, stating:

> Yes. So – and probably the better way to describe it is, would be Middle East-North Africa rights, primarily for Raw and SmackDown. So we – which we've had agreements in that region, both free-to-air with MBC and Pay with OSN. In the second quarter, I believe we said when we confirmed or supported the guidance for full year 2019 was that one of the things that subtended that was our expectation of a new deal in the market. That didn't come to fruition. **So we talked about it in the third quarter that we continue to work with [the Saudi General Sports Authority] on those rights. We think we'll get a deal then, but it didn't come to fruition in the time frame that we thought.**

**January 30, 2020 – Barrios and Wilson Abruptly Leave**

74.     On January 30, 2020, WWE suddenly announced the departure of Defendants Barrios and Wilson, two of the Company's most-senior and longest-serving executives. On the same date, WWE pre-announced its results for the fourth quarter of 2019, revealing that the Company "expects its full year 2019 Adjusted OIBDA to be approximately $180 million."[24]

---

[24] *See* Form 8-K filed with the SEC on January 31, 2020, https://www.sec.gov/ix?doc=/Archives/edgar/data/1091907/000109190720000003/wwe-20200130x8k.htm.

75.     On this news, WWE's stock price collapsed $13.42 per share, or 21.54%, wiping out tens of millions in once valuable shareholder equity on January 31, 2020.

**D.  <u>The Truth Concerning MENA Fully Emerges</u>**

**February 6, 2020 – WWE Announces the Failure to Complete an Agreement in the MENA Region**

76.     Just a week later on February 6, 2020, the Company announced its fourth quarter 2019 results and was forced to admit what the Defendants had long omitted. The earnings release revealed that consumer engagement metrics had continued to deteriorate in the fourth quarter, and that WWE only achieved $180 million in adjusted OIBDA for the year due to the failure to complete the MENA distribution agreement with the Saudis. WWE's interim CFO, Frank Riddick confirmed on a subsequent conference call addressing the results that WWE's 2020 financial guidance did not include any revenues related to a prospective MENA deal.

77.     The press release stated the following concerning the delays attributable to the Middle East:

> "For the year, we achieved record revenue and Adjusted OIBDA. However, **with the delay in completing a Middle East distribution agreement as well as lower business performance than anticipated, our results were at the low-end of guidance**," added Frank Riddick, interim Chief Financial Officer.[25]

78.     Later in the day, the Company held an earnings call to discuss its results. During the earnings call, in which Defendant McMahon and Frank Riddick confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal. When asked if "guidance for 2020 assumes... revenues associated with your rights -- TV rights or media

---

[25] *See* Form 8-K filed with the SEC on February 6, 2020, https://www.sec.gov/ix?doc=/Archives/edgar/data/1091907/000109190720000007/wwe-20200206x8k.htm.

rights in India and the Middle East," Frank Riddick responded: "**Well, on MENA, you're correct**."

79.     When asked later in the call to confirm whether the MENA media-rights deal assumptions were included in the 2020 guidance, Frank Riddick confirmed that the MENA deal was not included -- and, thus, if the deal was completed in 2020, it would be an addition to the projections:

> Yes, we're still pursuing those new agreements. And from our perspective, as quickly as we can get them done, that's what we're aiming for. And I think, as I explained earlier, the India rights are – we already have existing India rights and they are in the guidance because we're already doing, being paid under that arrangement. It would be the increment on India. But yes, there's – for MENA, it would be an addition to their guidance.

80.     During the call, an analyst asked: "[W]hat's taking so long for the MENA and India because we thought those were going to be done like early in '19. And … will we be done with those deals by the end of the first quarter when you're going to give us this comprehensive overview of WWE, do you think?"

81.     Frank Riddick responded: "The MENA rights, just the intricacies dealing with the Saudi Arabian government and their own ways of going about and doing business, I think we don't want to predict a specific date. But as I said before, the uncertainty is around the timing and the amount, not that these deals will eventually be done."

82.     Referring to the Company's 2019 performance, McMahon stated: "our performance was at the low end of recent guidance as we work through our Middle East distribution agreement and our ongoing efforts to strengthen our brand and customer engagement."

83.     Additionally, Frank Riddick disclosed that the Company's WWE Network subscribers were down for 2019: "WWE Network's average paid subscribers decreased 10% to

approximately 1.42 million...driven primarily by the impact of lower subscriber additions earlier in the year." This news reflected that the OSN Agreement had terminated earlier that year, meaning the Company lost WWE Network subscribers who previously had accessed it for free as OSN subscribers when the OSN Agreement was still in place.

84.     On this news, the Company's stock price tumbled another $4.50 per share, or 9.18%, to close at $44.50 per share on February 6, 2020.

### E.  Further Revelations

**April 23, 2020 – Earnings Call**

85.     In an earnings call with WWE shareholders and analysts almost three months later, Defendant McMahon confirmed that a media rights agreement for the MENA region still had not been reached, stating "[a]s far as the MENA rights is concerned, we're still working on those. Sometimes things move very slowly.  And that's one of those things.  We thought we would have our MENA rights done by now for sure.  We don't.  And there's some degree of uncertainty as to when that's going to happen."

### F.  Defendants' Improper Insider Stock Sales

86.     The officers of a Delaware corporation occupy a position of trust and confidence and must avoid use of their position for personal gain.  Corporate officers who sell their personal shares of the corporation's securities must first disclose all material facts.  Otherwise, they can breach their fiduciary duty by self-dealing.

87.     Here, Defendants heeded none of these prohibitions.  Defendants used their knowledge of material non-public insider information regarding the premature termination of the OSN Agreement and the Company's deteriorating relationship with Saudi Arabia for personal gain. While personally misleading shareholders, Defendants collectively sold over 3.4 million

shares of their personal WWE common stock, for proceeds exceeding $280 million through the following unlawful insider sales:

| Defendant | Position | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| McMahon | CEO | March 27, 2019 | 3,204,427 | $81.45 | $261,000,579 |
| Barrios | Former Co-President | February 27, 2019 | 37,100 | $83.73 | $3,106,383 |
| | | February 27, 2019 | 2,900 | $84.63 | $245,427 |
| | | July 22, 2019 | 63,758 | $69.98 | $4,461,784 |
| | | July 22, 2019 | 10,920 | $70.54 | $770,296 |
| Wilson | Former Co-President | August 8, 2019 | 158,134 | $69.30 | $10,958,686 |
| | | | | **Total Proceeds:** | **$280,543,155** |

88.     In particular, on March 27, 2019, only a few days before media rights under the OSN Agreement officially ended and a month before the Company issued lower-than-expected income projections for the second quarter of 2019, which resulted in the collapse of WWE's stock price, Defendant McMahon (armed with insider knowledge) sold 3,204,427 shares of his personal WWE common stock, for over $261 million in unlawful insider trading proceeds.

89.     Defendant McMahon's stock sales were suspiciously timed and large in amount. In fact, Defendant "McMahon's sales in the class period were 10 times higher as compared to a control period[,]" as the court in the Securities Action found.[26] In one day, McMahon disposed of approximately 10.1% of his holdings.

---

[26] *See* Securities Action Order Denying Defendants' Motion to Dismiss at 28.

90.     Defendant Barrios sold approximately $8.5 million of WWE stock on the open market. He disposed of approximately 74% of his holdings three days before the Company announced the end of the OSN Agreement on July 25, 2019.

91.     Wilson sold shares shortly thereafter on August 8, 2019, reaping proceeds of approximately $11 million. This insider selling all occurred close in time to the materially misleading statements made on July 25, 2019, and before the truth about WWE's relationship with Saudi Arabia began to emerge.  Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings and public statements regarding the Company's relationship with the Saudi government. These Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.

92.     Given that WWE's stock price declined to a low of $40.24 per share, the Defendants avoided millions of dollars in losses by selling their shares when they did. The following table illustrates just how much the Defendants saved by selling their shares before WWE's February 6, 2020 announcement:

| Defendant | Shares Sold | Price as of February 6, 2020 | Proceeds if Shares were Sold on February 6, 2020 | Losses Avoided |
|---|---|---|---|---|
| McMahon | 3,204,427 | $40.24 | $128,946,142 | $132,054,437 |
| Barrios | 114,678 | $40.24 | $4,614,643 | $3,969,249 |
| Wilson | 158,134 | $40.24 | $6,363,312 | $4,595,374 |
| | | | **Total Losses Avoided:** | **$141,328,094** |

93.     Moreover, Defendants personally made the materially false and misleading statements and omissions outlined herein.

94.     Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed material information about the Company's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board meetings and committees thereof, and reports and other information provided to them in connection therewith.

95.     These Defendants are liable as primary participants in a wrongful scheme and course of business that operated as a fraud and deceit on the Company and all persons and entities who purchased or otherwise acquired the Company's publicly traded securities, which included the dissemination of materially false and misleading statements (both affirmative statements, misleading statements, and material omissions) regarding the Company's business in the MENA region, including the premature termination of the OSN Agreement and the renewal of a key media-rights agreement.

96.     Defendants use of adverse, material inside information for personal gain is classic self-dealing.  This breach of fiduciary duty renders Defendants liable for the resulting damage and injury to the Company.

### DAMAGE AND INJURY TO WWE

97.     WWE has been severely damaged and injured by Defendants' unlawful dissemination of materially false information and self-interested insider trading.

98.     As the truth fully emerged in early 2020, and Defendants' deceit became public, shareholders sued WWE for violation of §§10(b) and 20(a) of the Securities Exchange Act of

1934. The Securities Action specifically challenges Defendants' misrepresentations and material omissions about the renewal status of the OSN Agreement and of a replacement media rights agreement with Saudi Arabia, as well as Defendants' suspicious self-dealing insider stock sales.

99.     On August 6, 2020, Judge Jed Rakoff of the United States District Court for the Southern District of New York issued the Securities Action Order Denying Defendants' Motion to Dismiss. In sustaining the Securities Action, Judge Rakoff concluded that Defendants' statements about the status of renewal of the OSN Agreement were materially false and misleading when made. "Given WWE could not have been engaged in such renewal negotiations at the time because OSN had already terminated the agreement, the complaint has adequately explained with particularity why defendants' "renewal" and "ongoing" negotiation statements were false and misleading."[27]

100.    Judge Rakoff further concluded that Defendants' misrepresentations that a media rights agreement with Saudi Arabia to replace the OSN Agreement was underway and soon to be completed were also materially misleading. When the statements were made, Judge Rakoff found that Defendants knew WWE was scrambling to find a replacement media partner in the MENA region, and by hiding this adverse material information from shareholders for months, Defendants were able to maintain the artificially inflated trading price of WWE stock. Judge Rakoff further found that Defendant McMahon's insider stock sales were not only suspicious in timing and amount, but also probative of Defendants' scienter.[28]

101.    Judge Rakoff also found the confidential witnesses' statements credible:

> Plaintiff first supports its claim that defendants' statements about the imminence of a media rights agreement with Saudi Arabia were misleading by providing testimony from a confidential witness

---

[27] *See* Securities Action Order Denying Defendants' Motion to Dismiss 10-11.

[28] *See* Securities Action Order Denying Defendants' Motion to Dismiss 27-28.

("CW-1") regarding the distance between the parties during their negotiations. Plaintiff alleges that CW-1 is a former employee of MBC, a media company partially owned by Saudi Arabia that was charged with negotiating on Saudi Arabia's behalf the proposed media agreement with WWE. […] Plaintiff alleges that when CW-1 joined MBC in the fall of 2019, he worked on a feasibility study related to a possible broadcast partnership between WWE and MBC, estimating the "value of the partnership" between the companies. […] According to the [plaintiff's complaint], CW-1 reported that in Fall 2019, MBC and WWE "were still worlds apart in terms of projected WWE subscribers as well as the annual licensing fees" by tens of millions of subscribers and dollars. […] **Plaintiff alleges that this testimony indicates that in July 2019 WWE could not, contrary to its representation, have "believe[d] it ha[d] an agreement[] in principle with the Saudi General Sports Authority on the broad terms for" "a media rights deal in the MENA region" and likewise had no basis to believe any such deal would be completed in 2019.**

As an initial matter, and contrary to defendants' claim, the Court may properly take account of the alleged testimony of CW-1, even though some of his testimony is based on hearsay and indirect knowledge. For a complaint to rely on information provided by confidential sources, such a source need only be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). This liberal standard make sense; the heightened demands of the PSLRA will often require plaintiffs to rely on the testimony of confidential sources, even where those sources offer indirect knowledge, that is, information and belief that is hearsay but plausible. Here, the [plaintiff's complaint] alleges that CW-1 worked for the company negotiating on Saudi Arabia's behalf, worked specifically on analysis related to the contemplated media rights agreement, and talked to others at MBC about developments in the deal during his time at MBC. […] **It is thus probable that CW-1 would have had access to information about the prior status of the MBC deal.[] The Court may thus take account of on CW-l's testimony.**

**When credited, CW-l's testimony supports the notion that WWE's stated belief that it had an "agreement in principle" for the MENA region in July 2019 was false and misleading.** Drawing all reasonable inferences in plaintiff's favor, the fact that the parties had not agreed on fundamental terms of a contract by the Fall 2019 strongly supports the inference that the defendants could not have had a near-final agreement a few months earlier.

***

Plaintiff's allegations that there was an undisclosed deteriorating relationship between Saudi Arabia and WWE also support its claim that defendants' statements about the imminence of a replacement media rights agreement were misleading. Plaintiff alleges that tension between the parties began when the Saudi government failed to make a timely payment of about $60 million to WWE for a June 2019 event WWE held in Saudi Arabia. […]. This tension escalated in October 2019, when WWE held an event entitled "Crown Jewel" in Saudi Arabia. […] Plaintiff claims that in retaliation for the late payments, defendant McMahon cut the live feed for the Crown Jewel event, which angered the Crown Prince of Saudi Arabia.[…] **As a result, according to plaintiff, the Crown Prince refused to let certain wrestlers leave the country, holding them "hostage" for some hours in an airplane before letting them take off. […] The CAC relies for these latter allegations on the testimony of an unnamed former wrestler for WWE ("CW-2") who was allegedly on the flight delayed by the Crown Prince. The CAC also relies on news sources reporting the incident. […].**

Defendants dedicate much of their briefing to disputing the truth of these allegations, suggesting that the relationship between Saudi Arabia was amicable throughout the class period. […]. As previously explained, however, the Court must accept as true the complaint's well-pleaded allegations, without regard to defendants' competing accounts. For the same reason, the Court is unmoved by defendants' protestations that plaintiff's allegations are based on hearsay and unreliable news sources. […] While the quality of supporting evidence may impact plausibility of a plaintiff's claim, a plaintiff need not offer admissible proof of its allegations for the Court accept them as true at this stage. Once appropriately accepted as true, plaintiff's allegations about the deteriorating relationship between WWE and Saudi Arabia plausibly support plaintiff's claims that WWE's statements were misleading. Parties with a relationship as unworkably tense as plaintiff describes are unlikely to have reached an "agreement in principle" at any point. **Taken together with plaintiff's allegations that the parties had not even agreed to basic terms of a contract by Fall 2019, this second allegation supports with particularity plaintiff's claims that the defendants' statements about the status of a replacement MENA deal were misleading.**[29]

---

[29] *See* Securities Action Order Denying Defendants' Motion to Dismiss 15-19.

102. As a direct and proximate result of the Defendants' conduct, the Company has lost and expended, and will continue to lose and expend, millions of dollars. The wrongdoing detailed herein has exposed the Company to myriad reputation and financial damages, including but not limited to:

a) A $39 million settlement in the Securities Action, subject to the court's final approval;

b) The loss of credibility with current and potential investors, who were not privy to the same material information Defendants' were;

c) The insider sales of 3.4 million shares negatively affected the stock price and thus were to the detriment of the Company and other shareholders;

d) Increased director and officer insurance premiums;

e) Possible restatements and good will impairments; and

f) Legal and accounting costs associated with litigation, investigations, and potential restatements arising out of Defendants' conduct, including the Securities Action.

103. Notwithstanding Defendants' dissemination of materially false information and self-interested insider trading, WWE's Board has not -- and will not -- bring legal action against Defendants who are personally responsible for this catastrophe. This is because WWE's Board is wholly subservient to Defendant McMahon and firmly under his domination and control.

### THE BOARD'S CONSTRUCTIVE REFUSAL AND EFFECTIVE REJECTION OF PLAINTIFF'S LITIGATION DEMAND

104. On November 24, 2020, Plaintiff served a litigation demand on WWE's Board addressing the egregious and unlawful self-dealing detailed herein. Specifically, Plaintiff demanded that WWE sue Defendants for breaches of the fiduciary duties of care, loyalty, and good faith, aiding and abetting breaches of fiduciary duty, and *Brophy* claims against each of the

Defendants. WWE acknowledged receipt of the demand and informed Plaintiff that a committee of independent directors was tasked with reviewing the claims.

105. As detailed above, the Board constructively refused and effectively rejected Plaintiff's litigation demand, and acquiesced to Plaintiff's conclusion that it had done so. The Board's refusal and rejection of Plaintiff's litigation demand is further evidenced by the fact that WWE never commenced suit against Defendants. Even more egregiously, the Company never even asserted cross-claims against the Defendants in the Securities Action, which only exists because Defendants sold their personal WWE stock at artificially inflated prices while misleading shareholders.

106. Delaware law is clear on a board of director's duty in this situation. Upon receipt of a pre-suit demand from a shareholder, the directors must evaluate the charges in good faith if they are to properly discharge their fiduciary duty to protect and preserve the corporation's assets.

107. Here, however, WWE's Board has ignored, constructively refused and effectively rejected Plaintiff's litigation demand and acquiesced to Plaintiff's conclusion that it has done so. By doing so, the Board has failed in its legal duty to protect WWE's corporate enterprise. Accordingly, Plaintiff may bring this action on behalf of WWE against Defendants for breach of fiduciary duty, waste of corporate assets, and unjust enrichment.

## CLAIMS FOR RELIEF

### COUNT I

#### Against all Defendants for Breach of Fiduciary Duty (non-*Brophy*)

108. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

109.    At all relevant times, Defendants served as WWE's top officers.  As such, Defendants owed WWE and its shareholders fiduciary duties of loyalty, good faith, and care. At all relevant times, however, Defendants breached their fiduciary duty by knowingly disseminating false and/or misleading material information and omitting material information regarding the Company's media rights partnerships in the MENA region.

110.    By virtue of their positions as officers, at all times relevant to the wrongdoing complained of herein the Defendants had the power to, and did, control and influence the business and management of the Company's affairs, including its role in the Company's media rights partnerships and agreements in the MENA region.

111.    Defendants breached their fiduciary duty by artificially inflating the stock price with false and materially misleading statements long enough for them to sell millions of their personal WWE shares at artificially inflated prices for substantial personal gain based on undisclosed adverse material information. The adverse material information regarding the Company's media rights in the MENA region was only privy to the Defendants because of their senior executive positions.  This violated Defendants fiduciary duty to avoid self-dealing.

112.    WWE has been damaged as a direct and proximate result of the Defendants' breaches of fiduciary duties .

113.    Plaintiff, on behalf of WWE, has no adequate remedy at law.

## COUNT II

### Against All Defendants for Waste of Corporate Assets

114.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

115.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, engage in internal investigations, and lose financing from investors and business from future customers who no longer trust the Company.

116.     Moreover, the Defendants' actions caused the Securities Action to be filed. On November 20, 2020, the Company announced a settlement amount of $39 million, subject to court approval, in the Securities Action.

117.     Because of this waste of corporate assets, the Defendants are each liable to the Company.

118.     Plaintiff, on behalf of WWE, has no adequate remedy at law.

## COUNT III

### Against All Defendants for Unjust Enrichment

119.     Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

120.     At all relevant times, by virtue of their wrongful acts and omissions, Defendants unjustly enriched themselves at the expense of WWE. While the Defendants personally made false and misleading statements to the public and before the truth fully emerged, Defendants avoided over $141 million in losses through their insider sales consisting of proceeds over $280 million, to the detriment of WWE.

121.     It is against equity and good conscience for Defendants to retain these ill-gotten gains.

122.     Plaintiff, on behalf of WWE, has no adequate remedy at law.

## COUNT IV

## Against All Defendants for Breach of Fiduciary Duty under *Brophy*

123.    Plaintiff repeats and realleges each and every allegation set forth above as though fully set forth herein.

124.    When Defendants sold over $280 million worth of their personal WWE shares, they were in possession of material, non-public information regarding the Company's prematurely terminated OSN Agreement and the effect of a rapidly deteriorating relationship with Saudi Arabia, both of which would have an adverse effect on any media rights agreement in the MENA region. The revelation of this impairment and the full truth concerning WWE's failure to procure any media rights agreement in the MENA region would destroy millions in market capitalization when revealed to the market.

125.    The foregoing information was proprietary, material, adverse, and nonpublic information regarding the Company's operations known only by WWE insiders. The information which formed Defendants' basis for their sales of stock was the type of information which the Defendants were specifically barred from trading upon. This information was a proprietary asset belonging to WWE which was usurped for the benefit of the Defendants and to the detriment of the Company.

126.    Defendants' use of this information was a breach of their fiduciary duty of loyalty. Defendants' insider sales of stock on March 27, 2019; February 27, 2019; July 22, 2019; and August 8, 2019 were predicated upon their possession of material, adverse, nonpublic information to which they had access as WWE insiders.

127.    The Company was damaged as a result of Defendants unlawful insider sales.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

38

A. Against Defendants and in favor of the Company for the amounts of damages sustained by the Company as a result of Defendants' breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and breaches of fiduciary duty and misappropriation of information under *Brophy*;

B. Awarding to WWE restitution from Defendants, and each of them, including ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

C. Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

D. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

**Plaintiff demands a trial by jury on all issues so triable.**

Dated: June 10, 2021

**Levi & Korsinsky, LLP**
Gregory M. Potrepka (CT30056)
1111 Summer Street
Stamford, CT 06905
T. (203) 992-4523
F. (212) 363-7171
gpotrepka@zlk.com

**Levi & Korsinsky, LLP**
Gregory M. Nespole (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
Ryan Messina (*pro hac vice* forthcoming)
55 Broadway, 10th Floor
New York, NY 10006
T. (212) 363-7500
F. (212) 363-7171
gnespole@zlk.com
dtepper@zlk.com
rmessina@zlk.com

*Attorneys for Jesse Rezendes*

I, Jesse Rezendes, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of World Wrestling Entertainment, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Jesse Rezendes

6-9-2021